23 C.C.P.A.(Patents)

## In re CARTER et al. *

### Patent Appeal No. 3540.

Court of Customs and Patent Appeals.
Nov. 25, 1935.

Forbes Silsby, of New York City (Benjamin Sweedler, of New York City, and Joseph A. Ryan, of New York City, of counsel), for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This is an appeal .from a decision of the Board of Appeals of the United States Patent Office affirming the Ex-

aminer's rejection of three method claims, numbered respectively 7, 8, and 9, in appellants' application relating to roasting ores. Four claims for an apparatus stand allowed.

Claims 8 and 9 read:

"8. In the method of roasting ores involving the roasting in gaseous suspension of finely divided sulfide ore and the production of sulfur dioxide gases at temperatures not substantially less than 1600° F. and containing entrained dust particles and condensable sulfuric acid, the improvement which comprises reducing the temperature of the exit gases of the roasting operation to not substantially less than the dew point of the contained sulfuric acid and not substantially more than 700° F. by heat interchange with a cooling medium maintained at a temperature not substantially less than the dew point of the sulfuric acid, whereby condensation of sulfuric acid is avoided and whereby the temperature and volume of the gases are materially reduced to permit subsequent removal of dust from the gases by means of a metallic dust separator.

"9. In the method of roasting ores involving the roasting in gaseous suspension of finely divided sulphide ore and the production of sulphur dioxide gases at temperatures not substantially less than 1600° F. and containing entrained dust particles and condensable sulphuric acid, the improvement which comprises reducing the temperature of the exit gases of the roasting operation to not substantially less than the dew point of the contained sulfuric acid by heat interchange with a cooling fluid maintained at not less than about the dew point of the sulphuric acid, whereby condensation of sulphuric acid is avoided, and then separating entrained dust from the gases."

Certain limitations contained in claim 8 are lacking in claim 7. Claim 7 also recites a reduction of the temperature of the exit gases "to not substantially more than 1000° F.," differing in that respect from the "700° F." recited in claim 8.

The appealed claims were held "not allowable over" patent No. 1,563,616, issued December 1, 1925, to one Fassotte.

Appellants' general object is the production from sulfide ores, particularly pyrites or fool's gold, of sulfur dioxide gases for use in the manufacture of sulfuric acid. To this end they designed

an apparatus for "suspension roasting of finely divided sulfide ores, such as flotation concentrates."

Suspension roasting of pyrites of the kind so described was old in the art, as illustrated by a patent to Cordy et al., No. 1,758,188, referred to in appellants' specification.

Appellants' specification relates, in substance, that in the roasting process the gases produced contain appreciable quantities of dust which must be removed from the gas stream before the gases can be utilized; that to effect such removal "various constructions and arrangements" of dust chambers in the gas line have been prepared, the prior art teaching being that usually such dust chambers, whatever their construction, are arranged immediately following the outlet of the roasting chamber; that the temperature of the gases at the time of leaving the roasting chamber are not substantially less than 1600° F. and commonly are in the neighborhood of 1800° F., and that the dust chambers of the prior art, because of the high temperatures and consequent large volume of expanded gases, have necessarily been of large size and constructed of refractory material.

The specific teaching upon which appellants' appealed claims rest is that of reducing the temperatures of the "exit gases" to the degrees defined in the claims. This reduction of temperatures, it is said, results in such a reduction in the volume of gases as to make possible the removal of the dust by means of a metallic dust separator of relatively small size instead of having the large sized chambers constructed of refractory material such as were used in the prior art.

To state it in another way, appellants claim a process whereby the temperature of the gases is reduced from the point of 1800° F., at which they emerge from the roasting chamber, to from 700° F. to 1000° F. as they enter the dust collector.

The means provided by appellants for reducing the temperatures of the gases consists of what is designated a "waste heat boiler," interposed between the roasting unit and the dust chamber.

The sole question to be determined, as the issue comes before us, is whether the Fassotte patent, which is in the same field of art as the application of appellants, discloses or teaches reduction of temperatures of the gases in such manner as fairly to anticipate appellants' method claims.

Appellants' apparatus differs in many respects from the apparatus of Fassotte, and there are features in the Fassotte process which appellants do not teach. For example, Fassotte teaches and claims the introduction of preheated air into the roasting unit of his device, a feature not referred to in the application of appellants.

Fassotte discloses, interposed between his roasting unit and his dust collecting chamber, a "heat exchanger" in which there are two elements designated as "economizers." The air which he preheats is passed through these economizers by means of pipes and the preheating is accomplished by heat being extracted from the gases as they pass through the economizer units. So preheated, the air is carried into the roasting chamber.

It is argued before us on behalf of appellants that Fassotte does not reduce the normal temperature of the gases (1600° F. to 1800° F.) in the system as a whole, and that in his device they enter the dust collecting chamber at practically the same temperature at which they leave the roasting unit.

To support this argument appellants apparently make the assumption that Fassotte's device requires, at first, a normal heating in the roasting chamber of 1800° F.; that in the economizers there are extracted, for illustration, 500° F. which is returned to the roasting chamber, thus increasing the temperature of the gases to 2300° F. as they exit from said chamber, and that upon passing into the economizers 500° F. continues to be extracted and returned, so that when the gases pass on into the dust chamber they are still at a temperature of 1800° F.

We are unable to deduce any such teaching from the Fassotte patent. There is nothing therein to indicate that he, at any time, obtains any higher roasting temperature than was normal in the prior art. So far as we can determine, he teaches nothing more, upon this particular feature, than the obtaining of at least a part of the required total volume of heat by extracting heat from the gases with which to preheat air that is passing to the roasting chamber.

Certainly, there is nothing to indicate that any of the heat so extracted is returned to the gases after they leave the heat exchanger and before they enter the dust chamber. In the very nature of things, therefore, the gases entering the dust chamber must be lower in temperature than when leaving the roasting chamber, just as they are, except perhaps in the matter of degree, in the process of appellants.

It is noted that Fassotte provides valves in connection with his heat exchanger by means of which the amount of preheated air flowing from it into the roasting chamber is regulated, and the natural presumption would seem to be that by means of these the temperature in the roasting chamber is kept at whatever point may be desired.

Fassotte teaches nothing as to the amount of heat which is extracted in his heat exchanger, and, so far as we can discern, he may very well extract as much as do appellants.

In any event, we can see no difference in principle between the two methods, and it is our view that the naming of specific degrees by appellants does not lend patentability over the reference.

The decision of the Board of Appeals is affirmed.

Affirmed.